Good morning, ladies and gentlemen. Our first case for argument this morning is Beardsall v. CVS. Mr. Coleman. Thank you, Your Honors. Greg Coleman here along with counsel at the table, Lisa White, Katrina Carroll, and Nick Sushu. We're here today and this morning about a product mislabeling case, specifically aloe vera product mislabeling cases, involving primarily for this court's consideration two products, through the earth, and a Walgreens product. As I know this court is aware, because this court has issued opinions concerning these types of cases, under Sue Shannick, and if my southern accent pronounces that correctly, this court found that cases just like this are primarily suited for consideration by the jury and not dismissed on a motion for summary judgment that occurred in this case, respectfully, as to the ruling of... You mean we had an aloe case? Aloe case, Your Honor. We had an aloe case? No, you didn't have an aloe case. I'm sorry. The Sue Shannick case was involving coffee pods and whether the representations with respect to those coffee pods and whether they were freshly ground versus instant, the court issued its ruling. What I was intending to say was, respectfully, Your Honor, that this case falls in line with the reasoning of the Sue Shannick case, with respect to why it should go to a jury, as opposed to being concluded as a matter of law that a reasonable consumer could not be misled. So in Sue Shannick, and I don't know how to pronounce it any more than you do, Mr. Coleman, but in that case, the plaintiffs offered evidence of not just one, but several consumer surveys indicating how reasonable consumers understood the label. We don't have any such evidence here. Well, there is some evidence, Your Honor, and I can explain how, and then this case, respectfully, was not at the point to where such evidence had been done. Summary judgment. Summary judgment, correct? Summary judgment, but it was before the class certification. You made that point in your brief. I have no idea why. Well, the point is, Your Honor, we have not completed merits discovery with respect to… This is summary judgment. I understand, Your Honor. It is, as we have said several times, the put up or shut up time. I understand. Whatever evidence you have has to be in the record now. Yes, and what the evidence that was in the record now says… Is there any consumer survey evidence in this record? No, but there are… Is there any evidence in this record about how much asamanin is needed for a therapeutic effect? Yes, that is contained in Dr. Edwards' report, and we've outlined it in the brief. He said therapeutic effect was beyond the scope of his expertise, didn't he? No, Your Honor. Respectfully, what he said was that there has to be 5% dry weight asamanin in order for there to be at a level that would comprise a therapeutic effect, and even Dr. Kelly, defendant's own expert, said he wouldn't use the adulterated process or products, in this case, for treatment of sunburn. Let me try this again. Okay. There has been a lot of medical research about aloe and asamanin. Does any of that research cover the question, how much is needed for a therapeutic effect? We believe, as we discussed in our brief, that IA… I'm not asking what you believe. Yes, Your Honor. I'm asking whether the research addresses the issue, and then I'd like you to point me to it. The International Aloe Science Council, the IASC, it's not a government-led body. I don't care whether something is government-led. I care what is in the published research, not trade groups. I want to know what is scientifically known about this thing. What is scientifically known about asamanin is that it does, at certain levels, provide therapeutic benefit, potentially with respect to sunburn and that sort of thing. Look, I'm asking a very particular question about the scientific literature. What in that literature tells us what concentration is needed for a therapeutic effect? Your Honor, I think asking me to prove a negative is very concrete. Look, I'm not asking anybody to prove a negative. There is often medical research about products, and one of the critical questions in that research is what concentration is needed. This morning, I had dental surgery last week. This morning, to promote healing, I took a product that is 0.012 percent active ingredient, and the medical profession thinks that that's quite enough for a therapeutic effect. That's because of research. I'm trying to figure out whether there is similar research about asamanin and what we know about it. Well, Your Honor, number one, the difference between what you were prescribed in this case, and I feel Your Honor's displeasure with what I'm trying to answer, that's a federally approved drug that has standards. I'm not asking about— These supplements have no standards. Mr. Coleman, it would be a good idea if you listened to the judge's question. I'm not asking about whether someone has approved something. Okay. I'm asking about the state of medical research. Are there studies by people who know what they're talking about who address the question what concentration is needed for a therapeutic benefit? The answer is we believe so, yes. If you're asking me to regurgitate— Okay. What study should I go and read? What is your best evidence? The studies that were promulgated in association with the testimony of Dr. Edwards, Dr. Pelley. In other words, you can't— If you want me to say it's the ABC study— Counsel, just one of us can talk at a time. Okay. I am waiting for you to cite something for me to go read, and so far you haven't done it. Is there some concrete study you wish me to go read that represents the best scientific evidence? Your Honor, I don't have what I believe you're looking for. Okay. Thank you. Judge Coleman, did you obtain through discovery any surveys that the defendants did concerning their labeling, marketing efforts, et cetera? We did, Your Honors, with respect to what the 30B6 witness, Dr. Huertas, Mr. Jose Huertas said, with respect to the consumer complaints that they were aware of concerning the labeling and mislabeling of the product, those sorts of things. So far as consumer surveys, because discovery has been bifurcated, we're not— Bifurcated how? Between class discovery and merits discovery. Usually—so merits discovery was done first? No, Your Honor. We were concerned and contending with class cert discovery, which is not the full panoply of everything that this court should have in order to rule on a motion for summary judgment at this stage. When the defense moved for summary judgment on the merits, did you file a Rule 56D request? No, Your Honor. We filed a response. You thought you were ready. No, we—Your Honor, we filed at the same time. We were given deadlines to file our class cert motion, which we also filed, and then the defendant concurrently filed a motion for summary judgment. We were given deadlines to respond to their motion, and they were given deadlines to respond to our class cert motion being fully briefed. Okay. Could I ask you also more specifically—I'm looking at—the defense put the labels in their briefs in a reasonably legible and colorful fashion. Looking at the Walgreens product, the private label product— Yes, Your Honor. I don't see any claims there to purity or 100 percent anything. What's the problem with that label? And we pointed that out in a brief. It's not the same as the fruit of the earth. The problem with the Walgreens label is the quality descriptors that they give, that it's powerful relief for sunburn, can heal dry skin, chafing, itching, and on and on, as the court can see and read on the label. That's the problem. There is no such evidence to support that any therapeutic level of asimmanid could do any of those things. That's the basis of the Walgreens claim. Okay, and that's—so that's where you're arguing that if you bring the suit, it's up to the defense to come forward with evidence to support the claims made on the label, right? That's absolutely right, Your Honor. Put another way, because this is where I think the trial court sort of turned it on its head. If I'm the marketer and the distributor, and I'm selling it and putting a product into the stream of commerce, and I'm going to make a profit off that product, I should know if the product has the things in which I'm making the representations. That's not the consumer's—I mean, how would a consumer be able to determine when you walk into Walgreens or whatever— That sounds like something the Federal Trade Commission might say. We are in court, and the normal understanding is the plaintiff has the burdens of production and persuasion. Why do you think this kind of litigation is different? Well, again, Your Honor, with respect to efficacy, they've never done a test for efficacy. No, no. And so if you're saying why haven't plaintiffs done— Counsel, please, listen to the question. I am, Your Honor. I am asking a question about the law. Normally, the plaintiff has the burden of production and persuasion. Agreed. But you're asserting that this category of cases is different. You can't support that assertion by pointing to what the defendants did or didn't do. You have to support that assertion by pointing to a statute, a regulation, or a decision of this court or the Supreme Court. So are there such statutes, regulations, or decisions? There are. Please tell me what they are. As we talk about in the second amended complaint, the operative complaint at page 26, we outline the federal regs, Your Honor, and then ICFA and the State Consumer Protection Act. I'm not going to go read your second amended complaint. I'm asking you a question. Right. You're at oral argument in the Court of Appeals. Please give me an answer rather than asking me to go read some other document. Yes, Your Honor. The answer is ICFA, the other State Consumer Protection Act, the federal regs of the FTC. What was that acronym? The Illinois Consumer Protection Act, Your Honor. You think it controls the burdens of proof and persuasion in federal court? Well, it outlines for the plaintiffs what it is we have to prove under the act. That's substantive. Judge Hamilton and I are now talking about who has the burdens. The plaintiff has the burden of proof, Your Honor. Okay. With respect to the claims it's asserting, yes. But in terms of, if I understood your question correctly, the efficacy, well, Your Honor, we can certainly prove efficacy or the lack thereof in the merits phase. But what we do know is that no testing of efficacy was done by the manufacturer of the product that's putting it into the stream of funds. Okay. On the allocation of burdens. No, we have the burden of proof, Your Honor. Agree. Okay. Agree. And I'm sorry if I frustrated the court. You're eating up your rebuttal time. Yes. Can I, if there are any other questions, can I keep the remaining time? You can certainly reserve your remaining time, Counselor. Thank you, Your Honor. Ms. Chiarella. Yes, Your Honor. Elizabeth Chiarella on behalf of the defendant. Two important facts are not in here. You have a low, delicate voice, and I appreciate it except for a reason. I can't hear you. Okay. I will try to speak up. I'm sorry. Two important facts are not in dispute in this case. Number one, the products contain 98% aloe gel. And number two, the presence of preservatives and stabilizers was acceptable to plaintiffs and something that they expected. They never expected aloe squeezed from a plant directly into the bottle. Their testimony was that they expected something to have been done to it to make it shelf-stable. So on the basis of those undisputed facts alone, there was no genuine issue of material fact here, and summary judgment was appropriate. Does the defense have any evidence of the efficacy of these products for sunburn? We do, Your Honor, in the sense that the majority of the plaintiffs testified that it worked for them. They purchased multiple bottles of it. Yes, but unfortunately we also know that people who wear copper bracelets are happy to give testimonials that that cures their arthritis, right? There are a lot of people who will say things that are not medically true. Is there any medical reason? This is the same question I asked Mr. Colbert. Is there any medical reason to believe that the concentration of asamannan in this product is therapeutic? There is no evidence in the record or that we're aware of that asamannan provides a therapeutic effect. The only evidence— There is quite a large scientific literature on that. I actually looked at some of it. It is well understood that asamannan has a therapeutic effect. But how much is needed in any given lotion or gel, I didn't see discussions of. Are your clients aware of any such questions or decisions or findings? No, Your Honor. There is no evidence in the record or that we are aware of that a particular amount of asamannan has any therapeutic effect. That sounds like you're selling placebos. Well, a couple points in response to that, Your Honor. These products make organoleptic claims, as Dr. Polley testified. What does that word mean? It means that you can tell with your five senses whether it is helping you. So you can apply it to your skin and determine whether it's cooling or soothing the skin. Actually, you can't. That's the same point as copper bracelets. People believe that if they wear a copper bracelet, it solves their arthritis. And as Judge Hamilton said, that's the placebo effect. Some people perceive a benefit that if you do serious study isn't there because it would be produced by rubbing lard on the same area, right? Or by wearing a copper bracelet. That's why the court is interested in the science of this and not folk wisdom. And you're right, Your Honor. There's no evidence in the record or that we're aware of as to how much asamannan would be needed to provide a therapeutic effect. And there's also no evidence in the record that other aspects of the product or other aspects of aloe do not provide a therapeutic effect. I did want to respond to Mr. Coleman's reliance on the Suchanik case. That case was entirely different. The defendant in that case was passing off real coffee as instant coffee. And there were multiple consumer surveys, as Your Honor pointed out, that showed the defendant's labels to be misleading in that respect. Here, no plaintiff has ever heard of asamannan. Plaintiffs provided no evidence that consumers would find the amount of asamannan in the product misleading. No, but there's testimony from some of the plaintiffs that they thought these extra ingredients were meaning that it's not 100 percent pure, right? Actually, the plaintiffs have admitted that preservatives were expected. Well, the plaintiffs, we've got right now a number of individual claims, correct? So did all of the plaintiffs admit that in their depositions? It was admitted throughout briefing and in the statement of undisputed facts. Okay. So, yes, I think that was admitted. Is it the defendant's view that, in essence, the combination of an asterisk and an ingredients label can fix essentially any problem with the product label and name? I'll give you an example. 100 percent organic milk, asterisk. And then there's a list of some six-syllable synthetic preservatives that are added to the milk. Is that okay? Can you tell me that hypothetical again? Prominent letters on the front of the carton. 100 percent organic milk. But there's an asterisk. And the asterisk says C ingredient label. On the back, you look, and there's a list that includes five six-syllable synthetic organic compounds that have been added. I think that would be considered an ambiguous label such that it is. Ambiguous or deceptive? Ambiguous, Your Honor. Why is that? 100 percent organic milk. Yeah. As in the 100 percent grated Parmesan cheese case and here, there's a question about what the 100 percent is not. I'll tell you. I thought the 100 percent grated Parmesan cheese means it's 100 percent grated, 100 percent Parmesan, and 100 percent cheese. A possibility that the district judge did not address in that opinion and which is, I think, the most obvious interpretation of that label. Okay. Well, and in this case, on page 7 of our brief where the label is, the phrase is actually 100 percent gel. It's aloe vera and then on a different line and in a different font set off by two different bars, it's 100 percent gel. It is 100 percent gel, I'm sure. But on the back, you say 100 percent pure aloe vera gel, right? Right. And you've got some plaintiffs who are saying that's not what I get when I look at the ingredient label. Well, the only thing that is added to this product is preservatives and stabilizers, and plaintiffs have admitted in the statement of undisputed facts that they expected to find those components in this product. What do you think you can add to a label that says 100 percent pure aloe vera gel? What do you think you can add to that product and still claim it's 100 percent pure aloe vera gel? Well, I certainly think you can add preservatives and stabilizers because we know that that's what consumers expected in this instance. Anything else? I guess I haven't considered that. I did want to clarify a point that was raised. There was a question of whether there were any consumer surveys in the record. There are not. That's a point on which the Suchanan case is distinguishable. I also wanted to address plaintiff's point that discovery was bifurcated. It was not bifurcated. There was, in multiple orders, a summary judgment deadline, and we were very clear that we always intended to move for summary judgment in accordance with that deadline. I did want to address just briefly the opinions of Dr. Edwards. We argued in our response brief that the district court incorrectly granted or incorrectly denied our motion to exclude Dr. Edwards. Plaintiffs said not one word about this in their reply brief, not one word, and case after case in this circuit says that when that happens, that's a waiver. We squarely raised the point. We're not necessarily, though, going to reverse a district court judgment or find that a district court erred simply because somebody failed to defend a particular subsidiary decision. So let's assume the district judge was right to allow the opinion as far as it went. How far did it go? Not very far, Your Honor. In fact, he had nothing to say of relevance to this case. He had nothing to say about Sunburn, although Appellant's counsel made it seem like he said something about therapeutic benefits of aloe. If you go read his report, he said, I am not opining on that. He said, Dr. Pelley talked about that, but that is not a concern that I share with him. That's what the record says on that point. Dr. Edwards had nothing to say about how consumers interpret labels, and he also didn't say that a product with the ACE man and levels that he found is not aloe. So he adds nothing to the analysis, even if you consider his opinion, but our point was that we think he was wrongly admitted. Unless the panel has any other questions for me, I would conclude by asking that the court affirm the decision of the district court. Thank you, counsel. Anything further, Mr. Coleman? Your Honor, real quickly, and I will be quick. I felt like I got turned on my head a little bit about the therapeutic levels. This is a labeling case, and so with respect to the labeling, is it to a reasonable consumer misleading to say that a product is 100% pure aloe vera gel when the evidence has shown there's less than 1%, and that's what I wanted to convey. Less than 1% what? I thought it was agreed between the parties that 98% of the stuff in the bottle was aloe. Water, of which 99% is water. Then you would be saying that it would be fraudulent if you just took a leaf of aloe and said this is 100% aloe. You would be saying that's a fraudulent claim because most of the stuff in that leaf is water. You're not making that claim. No, Your Honor, just making the mislabeling. You're making a claim, as I understand it, that first there are binders and stabilizers, that's 2%, and second, in the processing, asamenin is lost. Some, we're not sure how much, but some is lost. And that then leads to the question whether it is misleading to call something aloe if some, but not all, of the asamenin has been lost. Yes, Your Honor. Agreed. And then we need to know how much asamenin is needed for a therapeutic effect. And that's where I would cite to the testimony of their own expert, Dr. Pelley, who said he wouldn't use this adulterated product as a therapeutic process. It's not a scientific question or scientific finding. Understood. I thought maybe when you were seated you would perhaps do some research on the answers to my question. Yes, and that's what we were discussing, Your Honor, just wanting to see if we could do it in a way that would answer the court's question but also keep the focus on the labeling claim of what, if you say something's aloe and you look at the federal regs which says you can't use a product name and be misleading or deceptive and have any ingredient cure it. If it's misleading and deceptive, that's something an ordinary or reasonable consumer could be misled by, and that's a question for the jury. That's all I was going to say, Your Honor, and I'm fine with leaving it at that except for this one thing, the last sentence of the trial court's opinion. You know, I'm really getting lost. Okay. You go to the drugstore and you buy a bottle and the bottle says aspirin. Yes. Right? Aspirin is acetylsalicylic acid. Yes, sir. And if you look very carefully, you will discover that the amount of that acid in the pill is rather small. Most of the pill is binders, fillers, stabilizers, things that make it possible to deliver this to the consumer. Do you have a good legal claim that it is misleading to put the word aspirin on the front of the bottle without prominently revealing that most of the stuff in each pill is not an active ingredient? I think I would have a claim if the aspirin said 100% pure aspirin. It just says aspirin. No. If it's just aspirin, that's different. Even though most of the pill is anything but aspirin. Yes. If it's just aspirin, Your Honor, but here that's not the facts of the case, respectfully. It's 100% pure. Pure being a statement of purity, the other descriptors being statements of quality, and that's what I wanted to leave with the Court with the exception of. . . Okay. Thank you, Counsel. Thank you so much. The case was taken under advisement.